SIMON DEIMEL *et al.*

*v.*

WILLARD S. BROWN *et al.*

*Filed at Ottawa March 30, 1891.*

1. CHANCERY—*creditor's bill—to what creditors to apply.* Where a creditor's bill does not seek to set aside a sale of goods by the debtor as fraudulent, but to enforce payment of the price thereof on the ground it has never in fact been paid, it is immaterial that the bill does not show that the complainant was a creditor at the time of such sale.

2. SAME—*jurisdiction as to creditor's bill—residence of debtor—presumption.* A creditor's bill alleged, and it was proved, that the judgments on which the bill was based were recovered in the county where the bill was filed, and that executions were issued thereon to the sheriff of that county. On appeal, it was objected that there was no allegation and proof that the debtor resided in the county where the executions were issued and returned: *Held,* that the residence of the debtor in

that county would be presumed from the fact of service on him there, and proof of his residence a few years later, and also that the objection came too late for the first time in this court.

3. Same—*admission in answer—no proof necessary.* The rule in chancery is, that where a fact is alleged in a bill and admitted by the answer, such admission is conclusive of the existence of the fact, and other evidence to establish such fact is unnecessary.

4. Same—*sworn answer in chancery—as evidence.* The general rule is, that when an answer to a bill in chancery is required to be made under oath, and an answer is filed which is responsive to the allegations of the bill, then all material averments of the bill that are denied by such answer must be proved by the testimony of two witnesses, or by evidence which is equal to the testimony of two witnesses.

5. This rule, however, has no application to averments denied merely on information and belief, or when the defendant himself refutes the sworn statement in his answer. It is only when a defendant states facts within his own personal knowledge, that his answer has to be overcome by evidence equivalent to the testimony of two witnesses.

6. So where a defendant to a bill in chancery puts in a sworn answer, setting up facts connected with a sale of the partnership firm of which he is a member, but also states in such answer, or under oath in a prior garnishee suit, that he has no personal knowledge of the matters set up in the answer, his oath to such answer will give it no weight as evidence in favor of the defendants.

7. Same—*of evidence to impeach sworn answer.* On creditor's bill against a partnership firm, to recover the price of goods sold the firm by the debtor, one of the partners answered for the firm, under oath, that the goods had been paid for by the offset of an account against the vendor or principal debtor. The party so answering, when called as a witness, was evasive, and said he could not remember the facts, and could not answer without reference to the firm books, part of which he falsely claimed were destroyed by fire, and it was admitted that the books had been altered to cheat another person, and the book-keeper testified that the entries in regard to the matter involved had been changed, and that the dates of the entries of charges were not correct: *Held,* that these facts were sufficient to impeach the sworn answer.

8. Interest—*in case of fraud.* A fraudulent vendee or trustee is chargeable with six per cent interest on the price or value of the property or fund.

Appeal from the Appellate Court for the First District;— heard in that court on appeal from the Superior Court of Cook county; the Hon. Egbert Jamieson, Judge, presiding.

Messrs. Moses, Newman & Pam, for the appellants:

The residence of the debtor at the time of the issue of the execution is not shown. This is a prerequisite, and the decree makes no finding on the subject. *Durand* v. *Gray*, 129 Ill. 9.

Where a sworn answer was called for by the bill, so far as it is responsive to the bill, if it is not disproved by the testimony of two witnesses, it must prevail. *Richeson* v. *Richeson*, 8 Bradw. 204; *Bragg* v. *Geddes*, 93 Ill. 39; *Cissna* v. *Walters*, 100 id. 623; *Field* v. *Wilber*, 49 Vt. 163.

Where such answer sets up a material fact responsive to the bill, which is denied by two witnesses, and is sustained by the testimony of the defendant answering and another defendant, they all being equally credible, it can not be said the answer is overcome. *Hurd* v. *Ascherman*, 117 Ill. 501.

A sworn answer is of such force that the complainant can have no decree against the defendant until the same is disproved by evidence equal to that of one witness, and in addition thereto a preponderance of proofs sufficient to have sustained the bill if the oath to the answer had been waived. *Mey* v. *Gulliman*, 105 Ill. 272; *Catlett* v. *Dougherty*, 114 id. 568.

Presumption arising from mere non-production can not be used to relieve the opposite party from the burden of proof in his case. 2 Wharton on Evidence, sec. 1268; *Chaffee* v. *United States*, 18 Wall. 516; *Gage* v. *Parmlee*, 87 Ill. 330; *Joannes* v. *Bennett*, 5 Allen, 169.

The law indulges no presumption against a defendant for non-production of documents. *Law* v. *Woodruff*, 48 Ill. 399.

In considering testimony contained in answers, that which makes for defendants must be considered as well as that which makes against them. *Sawyer* v. *Moyer*, 109 Ill. 461;. *Howell* v. *Moores*, 127 id. 67.

The purpose of the interrogating part of the bill is to compel full answer to the matters contained in the prior part of the bill, and must be founded on these matters. Hence, if there is nothing in the prior part of the bill to warrant a par-

ticular interrogatory, the defendant is not compelled to answer it. Story's Eq. Pl. (9th ed.) secs. 37-39.

As to compliance with interrogatory, see. *Woodcock* v. *Bennett,* 1 Cow. 744, and note.

As to the effect of sworn answers as evidence, when responsive to either the charging part or interrogatory part of a bill, see *Bellows* v. *Stone,* 18 N. H. 465.

Messrs. TENNEY, HAWLEY & COFFEEN, Mr. E. C. CRAWFORD, and Messrs. CRATTY BROS. & ASHCRAFT, for the appellees:

Intervening creditors are properly allowed to join in the action. *Wakeman* v. *Grover,* 4 Paige, 23; *Pennell* v. *Insurance Co.* 73 Ill. 303; *Bank* v. *Dunyan,* 2 Bland, 254; Story's Eq. Pl. secs. 99, 102; *Meyers* v. *Fenn,* 5 Wall. 205; *Kinney* v. *Harvey,* 2 Leigh, 70; *Brooks* v. *Gibbons,* 4 Paige, 374.

The court had jurisdiction to render the decrees entered upon its findings. 1 Story's Eq. Jur. sec. 456, and cases cited.

It was not necessary for complainants to show that they were creditors at the time Deimel & Bros. bought the goods from Biersdorf. *Morrill* v. *Kilner,* 113 Ill. 318; *Jones* v. *King,* 86 id. 225; *Gordon* v. *Reynolds,* 114 id. 118; Bump on Fraudulent Con. 319.

The return of execution and the exhaustion of the legal remedy are sufficiently alleged and proved. *Stout* v. *Cook,* 41 Ill. 447; *Dodge* v. *Wright,* 48 id. 382; *Gage* v. *Griffin,* 103 id. 41; *Theological Seminary* v. *Gage,* id. 175; *First Nat. Bank* v. *Gage,* 79 id. 207; *Bowen* v. *Parkhurst,* 24 id. 257.

Complainants are not bound by the evidence of Joseph Deimel, but may disprove or discredit it. *Chambers* v. *Warren,* 13 Ill. 318; *Curtiss* v. *Martin,* 20 id. 557; *Rockwood* v. *Poundstone,* 38 id. 199.

It is only when the defendant in a suit states facts within his knowledge that his answer must be overcome by the evidence of two witnesses or its equivalent. *Fryrear* v. *Lawrence,* 5 Gilm. 325.

The refusal to bring their books into court raises the infer-ence that they would sustain complainants' claim. *Benjamin* v. *Ellington*, 80 Ky. 472; 1 Wharton on Evidence, 163; *Commonwealth* v. *Bell*, 34 N. H. 83; 24 Beav. 679; 1 Greenleaf on Evidence, 37.

If there be doubt as to what the books would show, the in-terpretation most unfavorable to the suppressing party will be adopted. *Cooper* v. *Gibbons*, 3 Camp. 363; *Crisp* v. *Anderson,* 1 Stark. 35; *Hanson* v. *Eustance*, 2 How. 653; *Barber* v. *Lyon,* 22 Barb. 622; *Clifton* v. *United States*, 4 How. 242; *Life Ins. Co.* v. *Insurance Co.* 7 Wend. 31.

If an accounting party parts with or destroys his books, the strongest inferences consistent with the rest of the case will be made against him. 2 Wharton on Evidence, 1264, 1265; *Gray* v. *Haig*, 20 Beav. 231.

Mr. JUSTICE BAKER delivered the opinion of the Court:

In September, 1884, Jacob Biersdorf, of 362 Canal street, Chicago, failed in business. Thereafter, Brown, DeTurck & Co. recovered, in the Superior Court of Cook county, two judg-ments against him, for the aggregate amount of $7291.64, besides costs; and Bean, Hughes & Co. recovered judgment against him, in the same court, for $410.87, besides costs; and William A. Comstock recovered judgment against him, in the county court of said county, for $499.13, besides costs; and Hammacher, Schlemmer & Co. recovered judgment against him, in said Superior Court, for $1285.34 and costs. Brown, DeTurck & Co. and Bean, Hughes & Co. joined in a creditors' bill, which was exhibited in said Superior Court, and William A. Comstock and Hammacher, Schlemmer & Co. filed inter-vening petitions. Jacob Biersdorf, Mrs. Jacob Biersdorf, the Sugg & Biersdorf Furniture Manufacturing Company, and the present appellants, Simon, Joseph and Rudolph Deimel, com-posing the firm of Deimel & Bros., were made parties to the original and amended bills and the intervening petitions.

Subsequently the complainants in the bills and the intervening petitioners dismissed their suits as against Mrs. Jacob Biersdorf and the Sugg & Biersdorf company. Answers and replications were filed, and the cause was heard upon the pleadings and proofs, and the court found the material allegations of the amended bill and the intervening petitions to be true, and entered a decree rendering judgments against Simon Deimel, Joseph Deimel and Rudolph Deimel, and in favor of Brown, De Turck & Co. for $8820.47, in favor of Bean, Hughes & Co. for $504.13, in favor of William A. Comstock for $608.42, and in favor of Hammacher, Schlemmer & Co. for $1437.19, and awarding executions for said several and respective amounts, and for costs. Appeals were taken by the Deimels from these several decrees in favor of different judgment creditors of Biersdorf, and by consent of parties the appeals were heard both in the Appellate Court and in this court as one appeal. There was a judgment of affirmance in the Appellate Court.

The theory of the amended bill and of the intervening petitions is, that in February, 1884, Biersdorf, the principal defendant, sold and delivered to the co-defendants, Simon, Joseph and Rudolph Deimel, (the firm of Deimel & Bros.,) two hundred and nine pieces of tingue plushes, at $1.65 per yard, and of the aggregate value of $14,700, and that said $14,700 remains unpaid and owing from the co-defendants to Biersdorf, and that they, for the purpose of keeping said money out of the reach of the creditors of Biersdorf, falsely claim and pretend that the purchase price of said tingue plushes has been paid and discharged, but that in fact the claimed payment was fictitious and colorable merely, and a part of a scheme to defraud the creditors of Biersdorf, and that since said money still remains unpaid, it ought to be applied in satisfaction of the judgments of the several appellees against Biersdorf.

The principal defendant and the co-defendants were called upon to answer under oath. The answer of Biersdorf states that for nearly three years prior to his failure he was, and

since has been, confined to his bed by sickness, and thereby compelled to leave the management of his business in the hands of one Max Berg, "and therefore has little or no knowledge of the condition or character of said accounts, or other matters connected with said business or its assets." It further states that he has neither possession nor control nor knowledge of his books of account. It admits that Rudolph Deimel, Joseph Deimel and Simon Deimel had numerous business transactions with him, in the way of purchasing goods of him, but denies that at the time of the filing of the bill of complaint a large part, or any part, of the purchase price of said goods remained unpaid, or that the Deimels were then or are owing him, on account of said purchases, $15,000, or any other sum.

The substance of the joint and several answer of Simon, Joseph and Rudolph Deimel is as follows: That some time in the month of February, 1884, they bought a large quantity of plush from Jacob Biersdorf, amounting in all to about two hundred and nine pieces. The plush was received in the month of February, 1884, and was what is known in the commercial world as "tingue" plush, and was of the value of about $14,700. The plush was paid for in the following manner: On the 29th day of January, 1884, Jacob Biersdorf had purchased from the defendants, lumber and merchandise to the amount of $12,787, and on February 7, 1884, to the amount of about $5502.50, and afterwards became indebted to them upon other transactions in the sum of about $1000, and that said accounts were adjudged and set off against each other, and the difference paid these defendants in cash or notes, which were afterwards paid by Biersdorf; that said settlement was made in September, 1884, and that at that time Biersdorf was indebted to the defendants in the sum of $19,000. They further answered, that they were not, nor is either of them, in anywise or to any extent indebted to Jacob Biersdorf, nor were they so indebted at the time of the filing of the original bill in said cause, and that they did not then have, nor

have they now, in their possession, custody or control, any property, of any kind or nature, belonging to Jacob Biersdorf, or in which he has or had any interest, claim or demand whatsoever, and that they hold no such property in trust for him, either directly or indirectly.

The matter to charge appellants, the purchase by them, in February, 1884, from Biersdorf, of a lot of tingue plushes, for $14,700, is claimed in the bill and petitions, and admitted in the answer. The rule is, that where a fact is alleged in a bill and admitted by the answer, such admission is conclusive of the existence of the fact, and other evidence to establish such fact is unnecessary. *Home Ins. Co.* v. *Myer*, 93 Ill. 271; *Morgan et al.* v. *Corlies*, 81 id. 72.

The matter in discharge of appellants, as stated in their answer, is, that on January 29, 1884, Biersdorf bought of them "lumber and merchandise" to the amount of $12,787, and on February 7, 1884, to the amount of $5502.50, and afterwards became indebted to them in the further sum of about $1000, and that in September, 1884, a settlement was made between them and the accounts set off against each other, and the difference paid by Biersdorf to them. It is admitted that these statements are responsive to the charges and interrogatories contained in the bill and petitions; but appellees deny the truth of such statements. The material issue in the case then is, whether or not appellants paid and settled for the $14,700 worth of plushes, as is represented by them in their sworn answer.

What weight have the sworn answers as evidence for appellants? The general rule is, that where an answer to a bill in chancery is required to be made under oath, and an answer is filed which is responsive to the allegations of the bill, then all material averments of the bill that are denied by such answer must be proved by the testimony of two witnesses, or by evidence which is equal to the testimony of two witnesses. This rule, however, has no application to averments denied upon

information and belief, or where the defendant himself refutes the sworn statements in his answer. It is only when a defendant states facts within his own personal knowledge that his answer has to be overcome by evidence equivalent to the testimony of two witnesses. (*Fryrear* v. *Lawrence*, 5 Gilm. 325.) In the case cited this court said: "While a defendant's answer, which is required to be sworn to, is made evidence in the cause by the complainant, it is only entitled to weight when it is entitled to belief; and if he chooses to swear to that which the court sees he can not, or which he admits he does not, know, he is entitled to no more credit and is subject to the same censure and condemnation as any other reckless witness who, the court sees, is trying to impose upon it his belief when he should only speak of his knowledge. The court is not a mere machine to weigh everything that is offered, without examining its value, any more when the defendant's oath is put into the scale than when examining the testimony of any other witness."

The answer of the defendant Biersdorf states, that in September, 1884, and for nearly three years prior thereto, he was, and for the greater part of the time since then has been, confined to his bed by sickness, and was compelled to leave the management of his business to one Max Berg, "and therefore has little or no knowledge of the condition or character of said accounts or other matters connected with said business or its assets." This admission thoroughly impeaches his answer as evidence, and renders his denial contained therein, of any indebtedness from Deimel & Bros. to him, of no probative force whatever. It is manifest that, at the most, such denial is based upon mere information and belief.

The joint and several answer of the appellants is sworn to by all three of them. The statements in said answer are made in positive and unqualified terms; but there is in evidence in the cause the record in a garnishment suit prosecuted in the circuit court of Cook county, in the name of Biersdorf, for the

use of Marshall Field & Co., against said Deimel & Bros., and it appears therefrom that in said suit it was sought to reach by garnishment the same fund that is here involved, and that the written interrogatories there filed covered the same transactions and facts that are embraced in the answer now under consideration. It further appears from said record, that while all three of the appellants joined in the answers made in said garnishee proceeding, yet the truth of such answers was sworn to by Joseph Deimel alone; that said Joseph there made affidavit that he was the only member of the firm who is personally familiar with all the matters and things referred to in the several interrogatories; and that said Rudolph and Simon Deimel also made affidavit that they are not personally familiar with all the matters referred to in the third, fourth, fifth, sixth and seventh interrogatories asked of them, as garnishees, and are unwilling to swear to the answers filed to the same, and that as to the matters referred to in said interrogatories, they were business transactions in the special charge of their co-partner, Joseph Deimel, who is personally familiar with the same. The purchase of the $14,700 worth of tingue plushes, and the supposed settlement therefor, all transpired during the year 1884. If in November, 1885, they had no such personal knowledge of the transactions relating thereto as would authorize them to make oath in respect thereto, it is impossible that in March, 1886, said matters were within their own knowledge. We think that the fact that Rudolph and Simon Deimel have sworn to the answer gives it no weight as evidence in favor of appellants.

Joseph Deimel also made oath to the answer. This made it competent evidence for the firm, and imposed upon appellees the burden of overcoming it, so far as it states matters in discharge of appellants, by evidence equivalent to that of two witnesses. Did the Superior Court err in its findings that this has been done?

In the answers sworn to by him in the Marshall Field & Co. garnishee proceedings, Joseph Deimel gave an account of the purchase by Deimel & Bros., in the month of February, 1884, of the lot of tingue plushes here involved, and also stated that Biersdorf was indebted to Deimel & Bros., in February, 1884, and prior to the time of purchasing said plushes, in a sum considerably in excess of the amount or price of said plushes, and the same was applied in payment of said indebtedness of Biersdorf to Deimel & Bros., so far as the purchase price of said plushes would extend in payment thereof, and to these answers added this: "All the foregoing matters appear upon the books of said R. Deimel & Bros." The deposition of Joseph Deimel was taken at the instance of appellees. We have read this deposition at length, as it appears in the record itself, and it impresses our minds as being evasive and disingenuous. In respect to almost all of the material questions asked him by appellees, he shields himself behind the plea that he does not remember. When questioned in regard to the details of the dealings of his firm with Biersdorf, he answers time and time again, and almost uniformly, that he does not remember—that he can tell nothing in reference to the particular matter inquired about without his books; that his ledger would show the transactions—that his books would show the transactions; that his ledger was in New York, and most of the other books destroyed by fire. An analysis of his testimony would require more time and space than the reasonable limits of an opinion would allow, but suffice it to say, that it is manifest therefrom that he has but little knowledge or recollection in respect to the dealings with Biersdorf, and that most of that was predicated upon what appeared upon the ledger and other books of his firm. He even states in his examination that he does not remember that he ever read the answer in chancery which is here under consideration, but that if he signed it he supposes that he read it. Upon the whole, his deposition has not favorably impressed us, and, in our opinion,

it goes far to impeach the force of his sworn answer. He afterwards, in obedience to a subpœna, produced the ledger before the master in chancery, and it was then desired by appellees "to examine him with reference to the items contained in the ledger which he here produces, and which, in his former examination, he claimed his inability to testify about on account of the absence of the books," but both he and his counsel refused to submit to such examination.

The account of Biersdorf, as it appears upon the ledger produced by Deimel & Bros., is as follows:

| 1883. | | | | | | |
|---|---|---|---|---|---|---|
| Aug. 30. | 6 off cash, 1—1888.. | | $20 00 | Sept. 14 | By cash, 244. | $20 00 |
| 1884. | | | | | | |
| Jan. 29. | Reg. 1—557... | 12,787 00 | | Aug. 20. | By bills rec. 160. | 456 00 |
| Feb. 7. | 1—571... | 5,502 50 | | do | " " " 654. | |
| Aug. 20. | To cash, 58... | 1,090 00 | | Sept. 11 | By cash, 61. | 18,289 53 |
| | ... | 20 00 | | | | |
| | | | $19,419 53 | | | $19,419 53 |
| Oct. 22. | To cash, 71... | | $450 00 | Dec. 31. | By mdse., 104. | $1,110 00 |
| Nov. 22. | do 78... | | 654 00 | | | |
| | | | $1,110 00 | | | $1,110 00 |

The items which appellees claim to be false and fraudulent are the charges, "1884, Jan. 29.—Reg. 1—557 . . . $12,787," and "1884, Feb. 7.—1—571 . . . $5502.50," and the credit, "Sept. 11.—By cash, 61 . . . $18,289.53." It is supposed that the order book and impression or bill book of the firm would throw light upon the above items of charge, but they were not produced by appellants. It is stated by Joseph Deimel in his deposition, that most of the books, other than the ledger, were lost by fire; but in this he is contradicted by Taylor, who was book-keeper, and by Drown, who was assistant book-keeper, of the firm, and the substance of their evidence is that the books were preserved in the vault, and that they did not know of any books having been lost or destroyed by the fires.

It appears from the testimony of Taylor, which is corroborated by that of Drown, and by that of Jenkins, an employe

of a firm of bookbinders and printers, that he (Taylor), in 1885, by direction of Joseph Deimel, removed some eighty leaves from the order book of Deimel & Bros., which included a large part of the year 1884, and covered the transactions with Biersdorf, and caused to be ruled and paged and bound in the book an equal number of blank pages of like paper, and on which were written up orders for goods, including fictitious orders of goods for Biersdorf; and at the same time pages containing copies of pages of bills to purchasers of goods were removed from the bill book, covering a part of 1884, and blank leaves, corresponding to those removed, were inserted therein, and the book rebound, and that bills were entered therein to correspond with the orders entered in the mutilated order book, and that a solution of coffee was used to give the substituted leaves the appearance of age. This evidence is wholly uncontradicted; and its truth was further made manifest by the production in court by Taylor, under an order of court, of the leaves which had been removed from the order book.

Upon page 29 of the loose sheets produced by Taylor appears a supposed Biersdorf order, as follows:

"J. D."                    *January 28.*

*4749.—Jacob Biersdorf, 362 Canal St., City.*

4758   50 pieces olive 1, U. I. Tingue plush, embossed Franklin.
     50   "    gold 0, Tingue plush, embossed Franklin.
     25   "    blue 4,   "    "    "    "    $1.55 per yard.
     25   "    green 2,  "    "    "    "
     50   "    red 2,   "    "    "    "

Terms, net 60 days, to be delivered Jan'y 29th, or 5 p. off 10 days.

J.

It appears from the testimony of Taylor, that in the order book as altered, lumber was substituted for plushes, and that the same change was made in the bill book. The charge in ledger, January 29, $12,787, is based on the order of January 28, and corresponding entry in bill book. He also states that the items which constitute the charge of $5502.50 were changed in the order book and in the bill book.

These mutilations of their books is admitted by appellants, but it is claimed in their behalf that the object in view was not to defraud the creditors of Biersdorf, but to defraud Marshall Field & Co. in a suit for damages brought in New York by Deimel & Bros. against said Marshall Field & Co., for breach of a contract to deliver in the month of February, 1884, a large quantity of tingue plushes. It is suggested, that if the charges against Biersdorf for $12,787 and $5502.50 were just charges, it is immaterial to said creditors whether they were predicated upon items for plushes sold or items for lumber sold. It is readily perceived how it might have been for the interest of appellants, in said damage suit, to show that in order to supply the demands of their business they had been compelled to go into the market and buy from Biersdorf $14,700 worth of tingue plushes, at $1.65 a yard; and so, also, it might have been for their benefit in said suit, for the purpose of enhancing damages or creating a fictitious price for such goods, to have manipulated their books to show fictitious and unreal sales of plushes by them. But here the falsification of their books is not explainable upon either of these theories. The purchase of plushes from Biersdorf was not shown by the books, either before or after the mutilation, and by the alterations, charges which before that indicated sales of plushes by them, were changed to sales of lumber. It is difficult to see what bearing the sale of lumber by appellants to Biersdorf would have in the litigation for the non-delivery of silk plushes to appellants by Marshall Field & Co. It is more reasonable to suppose that for some reason it was deemed unadvisable that the books should show such very large sales of plushes to Biersdorf, or that at or about the time they were buying plushes from Biersdorf at $1.65 per yard, they were also selling him many thousands of dollars' worth of the same quality of plushes at $1.55 a yard, and that the changes made were in furtherance of a plan to still further cover up the fund

of $14,700, and conceal it from the creditors of Biersdorf, said Biersdorf having failed in business some months before.

That which we have above said proceeds upon the theory that the entries upon the ledger of $12,787 and $5502.50 were made prior to the changes made in the books, but that such was the case is not at all clear from the evidence. Taylor, in his evidence taken before the master, says: "The entries, $12,787 and $5502.50, in January and February, 1884, were not made at those dates, but a considerable time afterwards, and after the mutilation of the books, and not from actual transactions occurring in Deimel's business." Subsequently, on his cross-examination, he states that the entries on the ledger were made according to the dates there shown, but that the items which constituted the charges of $12,787 and $5502.50 were altered—changed in the order book and in the bill book, which were made over and leaves put in. It is evident from the testimony of Taylor that he was an unwilling witness for appellees, and desired to tell as little as possible that was injurious to appellants; that he was quite considerably under the influence of Joseph Deimel, and that the latter interviewed him frequently, prior to and pending his several examinations as a witness, in respect to his testimony, and sought to influence him in regard to the evidence he should give. We are inclined to think that it would be conducive to a just result to take his statements most strongly against appellants.

In respect to the credit, September 11, of $18,289.53, Taylor testifies, among other things, that it represents no real transaction of that date—that to preserve the balance, cash was debited with that amount and credited with merchandise charged to Biersdorf; that it appeared as though the amount had been paid in cash and charged to merchandise, and to Moses L. Miller, a brother-in-law of the Deimels, and that Joseph Deimel instructed him to credit Biersdorf for cash, and

charge it up to some such account, where it would not attract attention.

On June 2, 1885, about the time that the books were mutilated and changed, Joseph Deimel telegraphed from New York to Charles L. Miller, who was his brother-in-law and a son-in-law of Biersdorf, as follows :

"Don't neglect to see Max as per my letter to Rudo. If any one should ask him anything, he can say he remembers nothing, and his books are lost, but if they give him time he will try to refresh his memory. Write me if any one has been to see him; do so to-day, as it is important; look him up, wherever he is.                                         JOE."

The reasonable presumption is, that the "Max" mentioned in the telegram was Max Berg, who was a brother-in-law of Biersdorf, and the book-keeper and business manager of said Biersdorf. It is significant, when taken in connection with this telegram, that Biersdorf states in his sworn answer "that he has neither possession nor control nor knowledge of his books of account," and that notwithstanding the efforts which the record shows were made in that behalf, said books of account were not obtained and brought into court.

There is nothing whatever in the record to suggest that the charges of January 29 and February 7, 1884, were for any merchandise or consideration other than lumber or plushes. There is no evidence, except that of the sworn answer, tending to show that appellants sold lumber to Biersdorf. The deposition of Henry Stahl, who was foreman for Biersdorf, and the other evidence in the case, renders it reasonably certain that no lumber was so sold. The testimony of Rudolph Deimel, of C. L. Dietrich, (who, in 1884, was shipping clerk of Deimel & Bros.,) and of E. G. Markus, a teamster in the employment of the firm, tends to show the sale and delivery of plushes by appellants to Biersdorf in the early part of 1884. The statements of the first are impeached by the affidavit which he made

and filed in the Marshall Field & Co. garnishment proceeding. If we should assume the matters stated by all three of them to be true, yet they are not inconsistent with the theory of appellees, that shortly before the failure of Biersdorf, and in contemplation thereof, said Biersdorf, through Max Berg, purchased large quantities of plushes from his creditors and re-sold them to appellants, and with the intention of depriving such creditors of the fund realized from such plushes; that Deimel & Bros. were active participants in the contemplated fraud, and that the hauling of plushes to and fro between the places of business of Deimel & Bros. and Biersdorf was simply part and parcel of the plan to cover up and conceal the actual facts.

Under all the circumstances of the case, we are unable to say that it was error in the Superior Court to arrive at the conclusion that the other evidence in the case was sufficient to successfully impeach and overcome the sworn answer of Joseph Deimel.

Some minor points seem to require brief attention. It is objected, citing in that behalf *Durand & Co.* v. *Gray, Kingman & Collins,* 129 Ill. 9, that in respect to some of the judgment creditors it does not sufficiently appear, from the pleadings and proofs, that legal remedies have been exhausted, since the residence of the judgment debtor at the time of the issuance and delivery of execution is not stated. It is both averred and proven that the judgments were recovered in courts of record in Cook county, and that the executions were issued to and returned by the sheriff of that county. In the absence of averment or evidence to the contrary, the presumption is that the defendant resides in the county where the suit is brought and judgment recovered. It appears from the record that on November 25, 1885, the summons herein was served on Biersdorf in Cook county, and the presumption is that he then resided there. It abundantly appears from the evidence, that in the latter part of March, 1889, said debtor was a resident of said county. The maxim, *probatis extremis, presumintur*

*media,* has application to the case. The objection was not made in the court below, and it is now too late to question the jurisdiction of the court of chancery for want of specific averments in the pleadings of some of the creditors of the place of residence of the judgment debtor at the dates when executions were sued out.

It is immaterial that the bill fails to state that the complainants were creditors when the Biersdorf transaction took place, in February, 1884. This is not a bill to set aside the sale of the plushes to Deimel & Bros. as being a voluntary conveyance of property without consideration and a fraud against claims of then existing creditors, but the case of appellees admits and recognizes the validity of the sale, and proceeds upon the theory that the indebtedness thereby created was fraudulently covered up and concealed, and that such indebtedness was a fund which really belonged to the judgment debtor. If there are assets of the debtor in the hands of appellants they can be reached by the creditors, no matter when the debts due to the latter were contracted.

The court, in its decree, found that the $14,700 had not been paid, and that said indebtedness, with interest thereon at six per cent per annum, amounted to $17,640, and that said sum of $17,640 constituted a fund to which the creditors had a right to resort for the collection of their claims against Biersdorf, and rendered judgments and awarded executions in favor of the several appellees, aggregating $11,370.21. The finding that interest was due on the $14,700 is assigned as error. A fraudulent vendee or trustee is chargeable with six per cent interest on the value of the property or fund. *Steere v. Hoagland et al.* 50 Ill. 377.

In respect to the remaining objections urged by appellants, we may say that we think them without merit, and that they do not call for special notice.

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*