HENRY M. FISH *et al.* Appellees, *vs.* CHARLES M. FISH, Appellant.

*Opinion filed June 18, 1908—Rehearing denied October 8, 1908.*

1. EVIDENCE—*statements in sworn answer are evidence, though not conclusive.* The statement of facts in a sworn answer to a bill which has not waived answer under oath, is, so far as responsive to the bill, evidence in favor of the defendant, and must be taken as true unless disproved by evidence equal in the probative to the testimony of two witnesses; but it may be impeached by its own improbability or the inconsistent conduct or declarations of the person swearing to it.

2. FIDUCIARY RELATIONS—*when equity will not permit party to accept a conveyance.* Equity will not permit a party occupying a confidential relation to an aged and infirm person of enfeebled mind to accept a conveyance of valuable property unless grantee clearly shows the transaction was entirely fair and free from any improper influence, particularly where the grantor was paralyzed, so as to be unable to sign the deeds, which the grantee signed in her name.

3. SAME—*proof of confidential relation raises presumption of influence.* Proof of the existence of a confidential relation between parties to a transaction of benefit to the dominant party raises a presumption of influence, which the latter will be required to overcome by proof that the parties dealt at arm's length, that no unfairness was used, and that the facts within his knowledge with reference to the transaction were communicated to the other.

4. SAME—*what facts are inconsistent with the claim of absolute ownership.* The facts that the confidential agent of an aged paralytic of enfeebled mind kept in a secret safe for several months deeds signed by him in her name conveying to him the bulk of her property, thereafter recording them singly, in separate years; that after the deeds were made he wrote to her other heirs speaking of some of the land as being still owned by her, and that after her death he communicated with the heirs with reference to their interest in the land, are inconsistent with his claim, in his sworn answer to bill for accounting, that he owned the property absolutely.

5. SAME—*what fact is inconsistent with claim that party owned house and contents.* An endorsement by the confidential agent of a deceased person, stating that the bill endorsed, which was presented by a servant against the estate of the deceased person for services as housemaid to such person between certain dates, was correct, is an admission by him that the servant, whom he had employed, was employed for the deceased person, and is inconsistent with his claim that he was at that time the owner of the house and its contents.

6. Costs—*when costs of additional abstract will not be taxed to appellant.* The costs of an additional abstract furnished by the appellee can be taxed to the appellant only when such additional abstract is in accordance with the rules of the court, and if a large part of the matter contained therein is improper, the court will not assume the labor of separating the proper from the improper matter but will refuse to tax any costs against the appellant.

APPEAL from the Circuit Court of Will county; the Hon. DORRANCE DIBELL, Judge, presiding.

EDDY, HALEY & WETTEN, (P. C. HALEY, and CHARLES H. PEGLER, of counsel,) for appellant.

J. L. O'DONNELL, and T. F. DONOVAN, (J. A. BRAY, of counsel,) for appellees.

Mr. JUSTICE DUNN delivered the opinion of the court:

The litigation in this case concerns the distribution of the property of Cornelia A. Miller, who died at her home in the city of Joliet in April, 1906, after eight years of helpless invalidism resulting from paralysis. She was a widow without children, and was the aunt of George M. Fish, Henry M. Fish (commonly known as Manning Fish) and Charles M. Fish, who are the parties chiefly interested in this litigation, being the sister of their mother. She was a woman of considerable wealth, accustomed to a liberal style of living, fond of her relatives and generous in her treatment of them. The three nephews in 1892, and previous thereto, had been engaged in the banking business in Joliet with their father, Henry Fish, under the firm name of Henry Fish & Sons. In that year the firm failed. Charles was then a widower, his wife having died a few months before, and he was living in his own home with his infant daughter, two and a half years old, and her nurse. His brothers were unmarried. Immediately after the failure, Charles, on the invitation of Mrs. Miller, left his home and moved with his daughter into Mrs. Miller's house, which

has ever since been their home. Besides her residence in Joliet and its contents Mrs. Miller owned a small farm near Joliet; some business property in Chicago; town lots in Harvey, in Cook county, and in Lake Bluff, in Lake county; real estate in California; a farm and some town lots in Iowa, and had' also a large amount of money invested in farm mortgage loans in Iowa. After Charles moved into Mrs. Miller's house he devoted his time to her business. He had no other occupation except the care of the property inherited by his daughter, and no property of his own, and nothing was said in regard to his compensation. He received Mrs. Miller's income and paid from it all expenses, including his own. In 1896 Mrs. Miller was first stricken, but soon recovered so as to go around the house, visit neighbors and go driving. In that year she had pen paralysis and gave Charles written authority to sign checks, and after her illness did not sign checks. In 1898 she executed a general power of attorney to him for the transaction of her business and never after signed any. paper. In that year she had another stroke of paralysis, and later a third but lighter one. After the second attack she was never able to walk or get out of her bed and was attended constantly by one nurse or more during the rest of her life. In 1898 Charles married again and three children of this marriage have been born. In 1899 Mrs. Miller made a will giving all her property to her sister, Mary V. Fish, the mother of Charles, George and Henry M. Fish, and in case of her death in Mrs. Miller's lifetime, to Charles, George and Henry M. in equal parts. Mrs. Fish died in 1903, before her sister. In 1901 Charles took in his own name a contract for the purchase of a lot adjoining Mrs. Miller's premises, and in 1903 a deed thereof was made to him. A barn was afterward built on the land so bought, the total cost for the land and the barn, about $5000, being paid from Mrs. Miller's means. In January, 1902, five deeds were prepared conveying to Charles M. Fish all of Mrs. Miller's

real estate except that in Iowa, which deeds purport to have been executed and duly acknowledged by her on January 24 and were afterward recorded. On Mrs. Miller's death Charles applied for letters of administration, but Manning refusing to consent to his appointment, he caused the will to be probated and took out letters executory. In May, 1907, Manning caused a citation to be issued out of the county court against Charles to require him to disclose and inventory assets of the estate which it was alleged he concealed. From an order requiring him to inventory omitted assets of the estate Charles appealed to the circuit court. Manning filed a bill against Charles in the circuit court to set aside the five deeds made in January, 1902, to have a trust declared in the barn-lot in favor of all three of the brothers, and for an accounting. George filed a cross-bill of a similar nature, and Charles filed a cross-bill praying that the circuit court take exclusive jurisdiction of the administration of the estate of Cornelia A. Miller. The cases were heard together and a single decree was entered covering all the issues, setting aside the deeds made in January, 1902, declaring a resulting trust in the barn-lot, declaring that a certain gift of personalty claimed by Charles was void, and referring the cause to a master in chancery to state an account between each of the brothers and the estate of Cornelia A. Miller. Charles M. Fish has appealed from this decree.

The original bill waived the oath of the defendant but the cross-bill of George M. Fish did not, and the answers filed were under oath. Later an amended bill was filed, in which the oath of the defendant was not waived, and appellant's answer thereto was verified by his oath. The statement of facts in the answer, so far as it is responsive to the bill, is therefore evidence in favor of the defendant, and must be taken as true unless disproved by evidence equivalent in probative force to the testimony of two witnesses. It is, however, subject to impeachment either by

its own improbability or the inconsistent conduct or decla-
ration of the person swearing to it. (*Deimel* v. *Brown,* 136
Ill. 586.) Charles M. Fish also testified generally in the
case, and the effect of the answer as evidence is to be con-
sidered in connection with his testimony.

In addition to the deeds of January, 1902, and the con-
veyance of the barn-lot to him in 1903, all of which the
appellant claims were gifts to him, he claims that in 1903
Mrs. Miller gave him, not by bill of sale but by word of
mouth, all the personal property at her homestead contained
in the house and barn, he being in possession of it all as her
agent at the time.

The issues raised by the pleadings and evidence relate
to Mrs. Miller's mental capacity at the time of the various
alleged gifts to Charles M. Fish and to his undue influ-
ence over her at those times. The voluminous evidence
contained in some fourteen hundred pages of the record is
contradictory and the testimony of witnesses cannot be men-
tioned in detail. Allowing to the answer of the appellant
all the force as evidence to which the rules of chancery
practice entitle it, we are convinced that the complainant
has sustained both issues by the measure of evidence re-
quired by those rules. After Mrs. Miller's second attack
of paralysis, in 1898, she lost control of her limbs, was un-
able to feed herself and was fed by her nurses like a child.
She was unable to control her bowels or urine, and did not
inform the nurses of her need of attention before or after
her movements but they had to look after her as if she
were a child. Her mind was full of delusions, which were
present with her a great part of the time. She would imag-
ine that she was in a hospital, and though the assurances
of her nurses could quiet her and convince her that she was
at home, in a few minutes the delusion would return. She
frequently imagined herself away from home and regretted
it. Sometimes she believed herself to be traveling; at
other times that she had lately returned from China and

Japan, where she had traveled some years before. Though she had not been out of bed for years, she would tell visitors that she had just been out riding in the morning, or that there had been company in the house the night before and she had been down-stairs and had a pleasant time. When she had two nurses she often did not know them apart or remember their names, but would call them in turn by a name which did not belong to either. When one of her nurses who had attended her daily for years, after being gone for a time, came to see her, she could not recall her or that she had ever known her, though efforts were made to have her do so. She imagined that people were in her room whom she had once known, and would call them by name and talk to them when no one was there but her nurse. When told that a certain person was present she would presently call that person by another name, and after being corrected would soon repeat the error, and when told that a person she had known was dead, she soon referred to him again as living and repeated the mistake when corrected. She would imagine that she was dead and give directions for her burial, and would be much relieved to be told, upon an examination of her pulse, that she was living. She told that she had a sarcophagus prepared for her burial, though she had not. She imagined that a stigma had been placed upon her by some action of the church, though there was no reason for such belief. Though past seventy years old she imagined she was about to be confined and asked the nurses to prepare for her confinement. She would take a book or paper to read aloud and would read something which was not in the book or paper. Some of the witnesses thought she did not follow or understand conversation. She would ask for her sister, Mrs. Fish, after she had died, and upon being told of her death would cry and feel bad, and then would ask if she was in the house and when she would come in and see her. Sometimes she said Mrs. Fish had been in the room. On the other hand,

235—26

it was testified to that Mrs. Miller was easily reasoned out of these vagaries and delusions and convinced that they were not real; that she was able to talk rationally and connectedly; that the Bible and newspapers were read to her, and that she seemed to understand them and would talk intelligently about them.

Witnesses for appellant testified that they believed Mrs. Miller mentally sound when they talked with her and observed her, and medical witnesses testified that the existence of the vagaries and delusions testified to, and the other circumstances of Mrs. Miller's condition, were not incompatible with sanity and the ability to transact ordinary business during lucid intervals. So far as appears she never did transact any business of any kind at any time. She reposed implicit confidence in Charles, who was her confidential agent, signed all her checks, handled all her money, took complete charge of all her affairs and wholly relieved her from all business cares. He did as he pleased, consulting no one and reporting to no one. He signed her name to the power of attorney by virtue of which he acted for her and to all the deeds made to himself, as well as to all leases, releases of mortgages or other papers requiring her signature. When he went to live with her he had no property, and he has never since engaged in any occupation whereby he has earned money. From the time he went to Mrs. Miller's home he and his daughter and her nurse were supported by Mrs. Miller, and after his second marriage his wife and subsequent children were also supported by her. She also contributed generously to the support and financial aid of both Manning and George, who had nothing to do with her affairs. There was evidence that Mrs. Miller said that she could not compensate Charles for what he had done for her if she should give him all her property, and Charles testified that she told him that Manning had had his education and George had had a good deal of money, while the appellant had had no chance to go into any business or

profession because he had been tied down to her; that she did not know how she could do without him, and that she intended to provide for him by giving him property. He also testified that she told him to have the deeds made out. He did so, signed her name to them and had a notary public come to the house. The deeds were taken into the room where Mrs. Miller was, and in response to the notary's question if she knew what the instruments were and acknowledged them, she either nodded or said "yes." The notary made no explanation to her as to what the deeds were. Charles also testified that Mrs. Miller told him when he contracted for the barn-lot, in 1901, that he might as well take the title in his name as it was all going to be his anyway, and when he took the deed to himself she was satisfied. He also testified to a conversation in which she gave him the property in the homestead.

During the ten years preceding Mrs. Miller's death the appellant received, as her agent, something over $160,000. This money was not re-invested and was not used in any business and no satisfactory account of its expenditure is shown. In addition to this, he permitted her to give him, according to his testimony, the house in which she was living, the household furniture in actual use, all her other personal property and all her real estate except the Iowa land, the income of which was entirely insufficient for her support and the total value of which would be consumed by her expenses in two or three years. She did not even receive from him an obligation for her support or the privilege of a room in the house. However good may have been appellant's intention, equity will not permit one occupying a fiduciary and confidential relation to accept from an aged and infirm person of enfeebled mind a conveyance of valuable property unless the grantee clearly shows that the transaction was entirely fair and free from any improper influence. Such a transaction is *prima facie* voidable at the option of the grantor, upon grounds of public policy. The

existence of the confidential relation creates a presumption of influence, which may be rebutted by proof that the parties dealt as strangers, at arm's length, that no unfairness was used, and that the facts in the knowledge of the one in the position of influence, affecting the matter, were communicated to the other. In *Thomas* v. *Whitney,* 186 Ill. 225, this court said (p. 231): "Transactions between a party and one bearing a fiduciary relation to him are upon his motion *prima facie* voidable upon grounds of public policy, and the burden of proof, the fiduciary relation being established, is upon the one receiving the benefit to show an absence of undue influence by establishing the fact that the party acted upon competent and independent advice of another or such other facts as will satisfy the court that the dealing was at arm's length, or he must show that the transaction was had in the most perfect good faith on his part and was equitable and just between the parties, or, as some of the authorities say, that it was beneficial to the other party." The same principle is stated in many other decisions: *McParland* v. *Larkin,* 155 Ill. 84; *Weston* v. *Teufel,* 213 id. 291; *Leonard* v. *Burtle,* 226 id. 422; *Morgan* v. *Owens,* 228 id. 598.

Appellant's conduct is inconsistent with his claim that the property honestly belonged to him. The deeds were made in January, 1902. They were kept secret in the safe for months. One was recorded in 1903, one in 1904, but the one for the homestead not until 1905. A few months before Mrs. Miller's death appellant wrote to Manning that he was going to California to try to sell some California land that Mrs. Miller had had for years. If his deed was valid, the implication that the California land still belonged to Mrs. Miller was false. A few days after Mrs. Miller's death he wrote to Manning, saying: "Bennitt will draw a paper showing you and George have an interest in aunty's real estate, so that in case anything happens to me you would be protected. He also will send you a paper agree-

ing to my appointment as administrator. I don't think there will be any inheritance tax, thanks to the deeds given to me eight years ago." A week later he wrote: "Bennitt is fixing the papers so as to protect your interest in case anything happening to me. He suggested that this should not be signed until we get under way with the administration papers, as there might be some kind of question as to inheritance tax, and this we must avoid." These letters could refer only to the lands conveyed to appellant by the deeds in controversy. The interest of Manning and George in the Iowa lands needed no protection. Appellant could do nothing with those lands. And Manning had no interest in the inheritance tax if appellant's deeds conferred sole ownership of the property on him.

A claim was filed against the estate in Iowa by Betty Erickson for $164.50 for services "as housemaid to Cornelia A. Miller from May 17, 1905, to April 16, 1906." Appellant endorsed on said claim an admission of its correctness. If Mrs. Miller had deeded the homestead to appellant and given him all the personal property she would not afterward be responsible for the housemaid's services. Appellant hired all the servants, and this was an admission by him that the housemaid had been hired by him, not for himself but for Mrs. Miller, and is inconsistent with his being the owner of the house and everything in it.

The decree of the circuit court was right and it will be affirmed. The costs of the additional abstract filed by appellees will not be taxed against appellant. Where the abstract furnished by an appellant is incomplete or inaccurate in any substantial part the appellee may file a further abstract, making necessary changes and additions, and may have the costs of such additional abstract taxed against the appellant, if in the opinion of the court such additional abstract was necessary. But such costs can be so taxed only when the additional abstract is in accordance with the rules of the court. In this case nearly one-third of the additional

abstract consists of the opinion and finding of the probate judge of Will county on a citation issued against the appellant, which has no proper place either in the record or the abstract, and other portions of the abstract were unnecessary. Where a large part of the matter contained in an additional abstract is improper the court will not assume the labor of separating the part which is necessary from that which is unnecessary, but will refuse to tax the costs against the appellant or plaintiff in error.

*Decree affirmed.*